712 A.2d 1181 (1998)
313 N.J. Super. 257
Fred HARRIS and Ella McAdams-Smith, Plaintiffs-Respondents,
v.
PERIDOT CHEMICAL (NEW JERSEY), INC., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 1998.
Decided June 22, 1998.
*1184 Gage Andretta, Roseland, for defendant-appellant (Wolff & Samson, attorneys; David Samson, of counsel; Mr. Andretta and Thomas Sabino, on the brief).
Brian E. Mahoney, for plaintiffs-respondents (Ginarte, O'Dwyer, Winograd & Laracuente, attorneys; Richard M. Winograd, Newark, of counsel and on the brief; Mr. Mahoney, on the brief).
Before Judges BAIME, WEFING and BRAITHWAITE. *1182
*1183 The opinion of the court was delivered by BAIME, P.J.A.D.
Plaintiffs Ella McAdams-Smith and Fred Harris brought this action to recover damages for injuries sustained as a result of their exposure to sulfur dioxide (SO2) and hydrogen sulfide (H2S) which were allegedly emitted by a chemical facility owned and operated by defendant Peridot Chemical, Inc. (Peridot). Following a protracted trial, a jury found that defendant was negligent and awarded plaintiffs approximately two million dollars. Defendant appeals. We affirm but remand the matter to the Law Division for recalculation of post-judgment interest.

I.
Plaintiffs were employed by Hoechst-Celanese as chemical operators responsible for loading and unloading petrochemicals to and from trucks, rail cars and ships. At approximately 8:30 a.m. on September 9, 1991, Smith was working on an elevated platform located a short distance from the boundary line fence separating her employer's facility from defendant's plant. Although her memory of the precise events was somewhat unclear, Smith recalled that she was loading a tank truck with formaldehyde or glycol, when she was suddenly overcome by the odor of "rotten eggs." Harris, who was working some distance away, noticed the same odor and, upon observing Smith in distress, immediately called for assistance using a "walkie talkie."
Smith was transported by ambulance to a nearby hospital where she received emergency room treatment. She was discharged later the same day. Over the ensuing months, Smith developed persistent headaches, dizziness, nausea and diarrhea. She also began to suffer lengthy spells of coughing marked by a sensation that her throat was closing. During this period, plaintiff was treated with oral steroids and bronchodilators. Her condition was diagnosed as "bronchitis due to sulfur dioxide and hyperactive airways." Although she continued to experience these symptoms, Smith ultimately felt her condition was improving and thus returned to work.
A second incident occurred shortly before noon on July 7, 1992. Smith and Harris were unloading butylene glycol, an odorless and essentially harmless chemical, from a tank car when Smith suddenly smelled and tasted "rotten eggs." Harris was at the top of the car when he heard Smith scream, "they are releasing this stuff." Initially, Harris was unable to smell anything unusual, but when he "turned [his] head toward" defendant's plant he too experienced the sensation of "smell[ing] and tast[ing] ... rotten egg[s]." Harris recalled that the odor of the substances "took [his] breath away." Despite his own distress, Harris noticed Smith "staggering" about "like a drunk person." Upon reaching Smith, Harris observed that her "eyes [had rolled] back in[to] her head" and she was "gasp[ing] for air." Other workers in the area came to the rescue and evacuated Smith and Harris from the work site.
Harris and Smith were taken by ambulance to separate hospitals. Smith was admitted to the intensive care unit, where she was maintained on a respirator for several days. Her admitting diagnosis was "sulfur dioxide inhalation." Pulmonary studies disclosed marked airway obstruction and impaired diffusing capacity. Lung examinations revealed "inspiratory crackles" *1185 indicative of alveoli damage. Smith was discharged nine days after her admission with a diagnosis of "sulfur dioxide inhalation." Within weeks of her discharge, Smith's hair fell out in large patches or "chunks."
Harris was admitted with complaints of upper and lower respiratory symptoms and neurologic sequelae such as general weakness and dizziness. The admitting diagnosis was "severe fume inhalation." Harris was treated with oxygen, steroids and bronchodilators. He was released after an eleven day confinement, but was readmitted shortly thereafter with complaints of respiratory distress. The principal diagnosis upon readmission was "occupational asthma, upper airway edema secondary to sulfur dioxide, diabetes mellitus, chemical conjunctivitis" and "hypertension." Harris was discharged seven days after his readmission.
The principal question presented at trial concerned the origin or source of the noxious fumes that caused injury to the plaintiffs. Plaintiffs contended that chemical processes at defendant's plant caused sulfur dioxide and hydrogen sulfide to be released in an airborne state. They asserted that these noxious gases migrated to their work site directly south of defendant's facility. Defendant claimed that the sulfur dioxide produced by chemical reactions at its plant were recaptured by its internal system and could not have migrated to plaintiffs' work stations at the neighboring Hoechst-Celanese plant. Defendant further contended that its facility did not have the capacity to produce hydrogen sulfide, and that the injuries sustained must have resulted from other sources including perhaps plaintiffs' failure to exercise reasonable care while loading or unloading chemicals at their work site. Much of the evidence presented at trial thus focused upon the operational procedures and chemical processes utilized by defendant and neighboring facilities.
The accidents occurred in a heavily industrial section of Newark situated along the banks of the Passaic River. Hoechst-Celanese operated a huge chemical plant at its Newark terminal. Plaintiffs' work site, known as the "east farm," was located on the east side of Doremus Avenue immediately south of the Peridot facility. While Hoechst-Celanese distributed a variety of petrochemicals and manufactured formaldehyde in various forms, none of its chemicals included sulfur or was sulfur-based. Moreover, none of those chemicals smelled like sulfur. Sulfur dioxide presents a pungent sulfur smell akin to the odor of a burnt match. Hydrogen sulfide smells like "rotten eggs." Plaintiffs' evidence indicated that no such odors emanated from any process carried on at the Hoechst-Celanese facility.
Reichold Chemicals, Inc. is located directly to the south of the Hoechst-Celanese facility. Reichold Chemicals never produced or manufactured sulfur-based products at its Newark plant. By defendant's own account, Reichold Chemicals was never the source of sulfur-like odors. The record contains nothing to suggest that Reichold Chemicals was the source of the noxious fumes that caused plaintiffs' injuries.
Quantum Chemical Company is located directly to the north of defendant's plant. Uncontradicted evidence disclosed that Quantum Chemical did not produce sulfur products. Nor was Quantum Chemical the source of pungent sulfur odors. Additional evidence was presented indicating that no facility upwind of defendant's plant was a likely or even remotely suspected source of sulfur gases. Moreover, no source or facility northwest of Peridot originated sulfur-like odors.
In contrast, defendant was engaged in the business of manufacturing, processing, shipping and storing sulfur-based chemicals. The five basic chemicals produced at defendant's Newark facility were sulfuric acid, liquid sulfuric oxide, ultra high purity sulfuric acid, aluminum sulfate and magnesium oxide. Virtually all of defendant's processes involved sulfur-based chemicals.
Defendant generated magnesium oxide for Philadelphia Electric Company. Production of magnesium oxide (MgO) was conducted in the MgO regeneration unit on the east side of Doremus Avenue. The MgO unit was situated nearest to the south-side fence or boundary of defendant's facility, directly adjacent *1186 to the Hoechst-Celanese east farm. Defendant's MgO unit is an irregular assemblage of structures and equipment. The unit was designed to recycle magnesium sulfite (MgSO3) to yield magnesium oxide for reuse by Philadelphia Electric as a stack scrubbant. The magnesium sulfite, in the form of fine powder, was trucked to the MgO plant. It was then air-blown with special equipment into silos, and then placed in a large preheated brick-lined vessel known as a calciner where it was subjected to extremely high temperatures and converted into sulfur dioxide in gaseous form and magnesium oxide in powder form. Those substances then followed an elaborate route through additional equipment. The sulfur dioxide exited the system through an interface valve into an on-site sulfuric acid plant where it contributed to the production of marketable sulfuric acid. The magnesium oxide was processed into a silo and later transported to Philadelphia Electric's facility. When the MgO unit was operating steadily, "more than 8,000 pounds of sulfur dioxide" could be processed in one hour. In just six minutes, the unit could produce 250 pounds of sulfur dioxide.
The MgO plant had several valves or pressure release points through which emissions could be released into the atmosphere. We need not describe in detail the mechanical design of the various valves, release points and stacks. Suffice it to say that six atmospheric outlets or emission points were clustered at a location directly upwind of Hoechst-Celanese's east farm.
According to testimony presented by defendant's plant manager, there had never been an occasion when the safety relief valves opened because of over-pressure during operations. Moreover, when the system was not working, it would be purged of existing processed gases by three giant blowers or movers, thereby routing such gases into the on-site sulfuric acid plant.
It was nevertheless possible that sulfur dioxide could escape into the atmosphere. The six emission points could release sulfur dioxide gases in situations in which the MgO unit was not running in a steady state. The "start-up" system, for example, required that the equipment be heated before the magnesium sulfite was routed into the calciner. If the system had not been purged of sulfur dioxide before its last shut-down, the start-up process itself would cause the existing sulfur dioxide in the pipes to be exhausted into the atmosphere. Specifically, the various blowers or fans could cause trapped gases to be released from the south stack. But even if the system had been purged prior to start-up, the blowers could not possibly rid all of the pipes and ancillary equipment of all trapped sulfur dioxide. Defendant's plant manager candidly conceded that "purging [was] never perfect [and that there were] always dead spots, bypass zones and dead-ended [areas] in which residuals" would remain.
The six emission points could also release sulfur dioxide gases in situations in which the MgO plant was running in a steady state. It was theoretically possible that the pressure relief valves could exhaust sulfur dioxide in the event of "over-pressure." Further, while the MgO unit was running at a steady state, sulfur dioxide could be emitted through leaky start-up valves or gaskets at the foot of the start-up stacks or through the pressure relief valves.
It is against this backdrop that we describe the operations of the MgO unit at or near the time of the two accidents. Prior to the September 9, 1991 incident, the MgO plant had been shut down. All witnesses agreed that "a cold start-up took place over a period of two or three days" before the accident. Defendant's employees were under instructions to start feeding magnesium sulfite into the calciner as soon as the appropriate temperature was reached. Log sheets indicated that sometime between 7:00 a.m. and 9:00 a.m. the operators had managed to establish a suitable temperature in the calciner. Additional entries confirmed that all three blowers were operating. Defendant's "MgO feed clock," the device that measures the quantity of magnesium sulfite fed into the calciner, indicated that the "feed" had commenced by this time.
Evidence was presented suggesting that at approximately the time the accident occurred, the MgO unit operators were experiencing difficulty in closing a start-up stack.
*1187 The log sheets contained a notation indicating that defendant's lead operator, Thomas Busby, was attempting to "fix" sticky gas booster fan vanes that had been stuck in their open positions since the prior day. As we understand it, these "vanes" consisted of louvers that, when open, could allow a volume of processed gases to be "jetted downstream." Although other entries in the logbook did not disclose any particular problem or "overpressurization," after 9:00 a.m. the super-heated temperature in the calciner was allowed to drift downward. The MgO unit was not fully restarted to operations until 5:00 p.m.
At approximately 8:00 a.m., several Hoechst-Celanese employees detected pungent sulphur odors downwind of the atmospheric outlets of the MgO unit. One worker, Val Dziuba, complained of an odor coming from Peridot. The smell was described as "like [the odor] when [a] match is ignited." Other workers and truckers indicated that they smelled a pungent sulphur odor at about the same time. Evidence presented indicated that although the winds were light, they were coming from north to south.
The circumstances relating to operation of the MgO unit on July 7, 1992 are shrouded in mystery. Defendant's main control logs disclosed no significant entries for systems usually monitored for operations. Hourly readings were not recorded that day between 8:00 a.m. and 2:00 p.m. for "critical sections of the main control room log sheets concerning pressures, flows, gas compositions, amp readings [and] temperatures." Moreover, most of the entries between 2:00 p.m. and 3:00 p.m. were made in pencil rather than pen.
The record indicates that the MgO unit's operators had experienced problems earlier that morning, and had reported difficulties in the acid plant, which received sulfur dioxide through the interface valve. At 7:45 a.m. the acid plant reportedly shut down. It was reported that the "big blue baby," the system gate valve located downstream of the wet electrostatic precipitator, had closed at 8:15 a.m. Although the testimony concerning the subject can fairly be characterized as arcane and hypertechnical, the record suggests that with the "big blue baby" in a closed state, a potential existed for "deadended" gases to be emitted from the "south start-up stack" if blowers upstream of the gate were placed in operation.
At approximately 8:00 a.m., the acid plant became operational. A "hot start-up" commenced at noon. In a hot start-up, the calciner has not substantially cooled and there is thus no need for an extended period to elapse in order to raise its temperature. Instead, the "back end" of the system is heated, the interface valve is opened and trapped gases flow into the acid plant. At 1:15 p.m., the feed was started again. It was undisputed that the wind was blowing from a northerly direction at the time of the second incident. Like the earlier September incident, numerous Hoechst-Celanese employees detected pungent sulfur odors at the time of the second accident.
Much of the evidence presented consisted of expert testimony. Plaintiffs' chemical engineering expert, Dr. Burton Davidson, testified that both sulfur dioxide and hydrogen sulfide are highly toxic substances. He theorized that a single fixed point 22.7 pound puff release of a combination of sulfur dioxide and hydrogen sulfide from one of the three vents or valves at the south start-up stack of defendant's MgO unit was the likely cause of both accidents. Davidson scaled the magnitude of the release in terms of a symbolic twelve foot diameter globe, using universal principles of ideal gas law. Based upon the MgO unit's log book entries, his study of the facility's operations and wind directions prevalent at the time of the incident, Davidson thought it highly probable that on both dates such a bubble was released, containing between eight to thirteen percent sulfur dioxide, and between three-tenths of a percent and three percent hydrogen sulfide and that the emission migrated to the area in which plaintiffs were working. The witness explained that the puff release immediately began wafting and spreading in the turbulent eddy fields, taking a tortuous path from north to south. Davidson cautioned that he was not suggesting the "center of this sphere contacted the breathing zones" of the plaintiffs, but that "a portion of that ball or a trace of it" meandered to their work site.
*1188 The witness testified that the gaseous emission would not necessarily have been detected by monitors in place at the time of the second accident, noting that the puff release was "affected by rear field turbulen[ce]" which caused the gases to "loop" over the buildings "before it came to ground level" at the east farm of the Hoechst-Celanese plant.
Davidson determined that both accidents could have been avoided had defendant installed a "scrubber system" or "feed-forward sensors." As explained by the witness, a "scrubber" is an arrangement of equipment and processes designed to capture discharged process gases and strip them of their hazardous properties. Such a system "would have chemically neutralized [the] captured gases before they enter[ed] the environment." According to Davidson, raising the stack height as defendant had done in the interval between the two accidents was insufficient to alleviate the danger.
Davidson concluded that in the absence of a scrubber system, defendant should have installed "an early warning system" so that those in the field of an advancing release could be evacuated. The witness asserted that all of Peridot's emission points should have been channeled or funneled to a single location at which forward sensors should have been installed. According to Davidson, the proper placing of such monitors would not be at the "fence line" separating defendant's plant from the Hoechst-Celanese facility. The fence line monitors that defendant had installed in the period between the two accidents were considered the "least desirable mode." Davidson opined that, instead, the sensors should have been placed at the foot of the inside of the stacks to detect discharges at their inception. The witness added that such sensors could be equipped with cascading alarms to alert personnel and permit rapid evacuation.
As we noted earlier, defendant denied that its MgO unit was capable of producing hydrogen sulfide. However, plaintiffs presented Dr. Jeffrey Schwartz, a Princeton University chemistry professor, who testified to the contrary. Dr. Schwartz concluded it was a scientific certainty that defendant's MgO unit produced gases containing hydrogen sulfide, downstream of the calciner. According to the witness, the process gases produced at the plant had a hydrogen sulfide content "in the range of about three-tenths to three percent, or in the order of 3,000 to 30,000 parts per million." Schwartz added that because of the toxicity of hydrogen sulfide, even 2,600 parts per million, or about one-quarter of one percent, presented an acute danger. Much of Schwartz's testimony concerning the chemical reactions that took place in the recycling of magnesium oxide was extremely technical, and we describe only the bare outline of the conclusions he reached. According to the witness, the components in the process gases were sulfur dioxide and water, which "react[ed] to give hydrogen sulfide." Schwartz stressed that this reaction was not the subject of theory, but rather rested upon "direct experimental observation by the leading figures in the history of chemistry." The witness noted that authoritative technical writers in the flue gas desulfurization industry were acutely sensitive to the "unstoppable" formation of hydrogen sulfide. The witness explained that minimization of hydrogen sulfide formation was heavily dependent upon the maintenance of super-high temperatures. Hydrogen sulfide formation increases as the components of the process encounters lower temperatures. Schwartz theorized that hydrogen sulfide was formed as the process gases cooled in their approximately two minute, 672 foot route to the interface valve after exiting the calciner.
Plaintiffs presented Dr. Richard Peskin as their expert in air dispersion science. Peskin discounted the applicability of "Gaussian plume" computer models which, as we understand, tended to negate the possibility that plaintiffs would have been effected by an emission from the MgO unit. A "Gaussian plume" refers to a description of the possible movement of a pollution contaminant in the atmosphere. Peskin testified that Gaussian plume computer models do not reflect the air dispersion of a contaminant in the "near field." More specifically, Peskin explained that plaintiffs' exposuresat 300 feet from the possible emission pointscould not be discounted or ruled out through the use of *1189 Gaussian plume computer models, as suggested by defendant's experts.
Plaintiffs' expert in occupational and environmental medicine, Dr. Elaine Panitz, described at length the toxicity of sulfur dioxide and hydrogen sulfide. She described sulfur dioxide as heavier than air and "a highly irritating, colorless, soluble chemical." The substance may present an acute danger when it penetrates beyond the "upper respiratory tract" to the "deep parts of the lung." Panitz explained that sulfur dioxide is considered "an irritant gas" rather than an asphyxiant, and that it does not have the capacity to damage the brain.
In contrast, Panitz described hydrogen sulfide as an asphyxiant gas, meaning that it has the capacity to cut off the utilization of oxygen within the body. She characterized the substance as "a very fast-acting poison," capable of causing workers "to literally drop dead in their tracks." Because hydrogen sulfide does not easily dissolve in water, it has the capacity to travel quickly from the upper respiratory tract to the deep lung areas. Panitz further explained that contact with the chemical often leads to brain impairment and dysfunction.
Panitz described how those two gases are "created in the work place" based on her study of toxicology literature within occupational medicine. Specifically, she noted that hydrogen sulfide was created as a result of "sulfur products processing," an industry of which Panitz said defendant was a part. According to the witness, hydrogen sulfide was "the number one hazard in sulfur processing plants" and was "so dangerous that the working recommendation is that it be monitored continuously." The witness added that as a result of its toxic qualities, "people in the field of occupational medicine consider hydrogen sulfide to be even more hazardous than cyanide gas."
As to this latter point, Panitz concluded that Smith's condition, toxic encephalopathy, and symptoms were "almost totally consistent with the symptomatology exhibited in case reports in the medical literature of other individuals with high level acute gas exposure who survived long enough to tell about it." Because both plaintiffs had "significant pulmonary and neurologic symptoms," as well as many of the neurologic symptoms mentioned in a "high level exposure category" set forth in a 1992 toxicology treatise, Panitz placed them within that category of probable exposure to 500 to 1000 ppm of hydrogen sulfide. That component, along with the duration of exposure, served as the predicates to her conclusion as to "the measurement or amount of exposure." Because Panitz's authorities indicated that at 500 to 600 ppm "it takes only 8.5 minutes to kill animals or humans," she opined that Smith's exposure was in the "five to ten minute range." Her opinion as to Harris was also of an exposure of hydrogen sulfide and sulfur dioxide in the 500 to 1000 ppm range for a period "of perhaps three to five minutes" on the second accident date.
Panitz described Smith's diagnosis following the second incident as "[h]igh level acute exposure to hydrogen sulfide and sulfur dioxide" resulting in "toxic encephalopathy." She opined that Smith could not succeed in maintaining any kind of employment. Panitz characterized Smith's condition as permanent. She added that Smith's prognosis was "poor with high risk for status asthmaticus and sudden death from respiratory insufficiency."
Panitz's diagnosis of Harris was similar. According to the witness, he too had a "high level acute exposure to sulfur dioxide and hydrogen sulfide" resulting in "toxic encephalopathy." Although Harris had returned to work, Panitz deemed that course as highly improvident. Panitz opined that Harris's condition was permanent. Like Smith, Harris's prognosis was said to be guarded in that he had an "increased risk for sudden death from status asthmaticus."
Because its evidence is not at issue in this appeal, we see no need to recount at length the testimony presented by defendant's experts. Defendant's expert in chemical engineering, Dr. Frederick Camp, sharply disagreed with Dr. Schwartz's conclusion that hydrogen sulfide was generated in the chemical processes at the MgO unit. Camp also disagreed with Dr. Davidson's opinion that sulfur dioxide was released from any of the *1190 unit's emission points on either September 9, 1991 or July 7, 1992, rejecting the thesis that a pressure surge could have disturbed the closed valves on the gas booster fan vent and the starter stack, or that unpurged residual sulfur dioxide escaped during the hot or cold start-ups.
Michael Neilson, a meteorologist, testified as defendant's expert in air dispersion modeling. Utilizing various plume models and different wind directions, Nielson concluded that the amount of sulfur dioxide or hydrogen sulfide reaching plaintiffs' work station was minuscule. Moreover, at least one of the plume models indicated a "touchdown distance" well beyond plaintiffs' approximate locations.
Defendant additionally presented several medical experts who asserted that plaintiffs' complaints were grossly exaggerated, and that their neurologic and pulmonary conditions were neither severe nor permanent. These witnesses discounted the possibility that either plaintiff suffered from a disabling condition.

II.
Defendant first argues that the trial court erred by admitting evidence relating to other instances in which gases were released from the MgO unit. These releases allegedly occurred both before and after the dates of the accidents. Defendant claims that this evidence should have been excluded under N.J.R.E. 404(b). It is argued alternatively that the trial court committed plain error by failing to provide a limiting instruction pertaining to this evidence.
We briefly summarize the evidence bearing upon this issue. Several Hoechst-Celanese employees detected the odor of rotten eggs which they attributed to the MgO unit. On at least three or four occasions prior to the September 9, 1991 accident, these individuals reported to their supervisor the presence of pungent sulphur odors in the east farm area, particularly when the wind was blowing from the north. The complaints were forwarded to defendant.
Similar instances occurred following the dates of the accidents. Hoechst-Celanese developed a protocol in which such incidents were recorded. These documents were referred to at trial as "records of contact." Evidence was presented relating to ten such records, all involving alleged gas releases between October 30, 1992 and January 14, 1994. Some of the records of contact referred specifically to fence line sulfur dioxide monitor alarms. Others described complaints of employees regarding "sulfur smells" emanating from the MgO unit. Several of the records of contact indicated that reports had been forwarded to defendant and nothing amiss had been discovered. Others indicated that investigation of the complaints by defendant's employees disclosed minor gasket leaks and problems with ductwork on start-up vents. And finally, some of the records of contact disclosed that employee complaints had been investigated by Hoechst-Celanese officials who found no specific contaminant problem. We add that not all of the records of contact referred specifically to defendant's MgO unit.
The trial court admitted this evidence over defendant's vigorous objections. Specifically, the trial court found that the evidence of other releases was "relevant" and that its probative worth was not outweighed by its potential for undue prejudice. Although plaintiffs' attorney suggested that a limiting instruction could be "crafted" confining the jury's consideration of the testimony to the material issues, neither party submitted a request to charge, and defendant did not interpose an objection to the jury instructions given. The record does not indicate whether the failure of defendant's attorney to request such a charge or interpose an objection was a calculated decision or a mere blunder. As we will note later in this opinion, cogent arguments can be made to support either of these hypotheses. It suffices at this point to emphasize that no limiting instruction was given.
Our evidentiary rules have historically prohibited admission of evidence of other crimes or wrongs except for limited purposes. Evidence Rule 55, the precursor to N.J.R.E. 404(b), barred the introduction of evidence of other crimes or civil wrongs when offered for the purpose of showing a *1191 person's disposition to prove that the person acted in conformity with that general propensity. That policy has been carried over into N.J.R.E. 404(b), which contains language identical to its federal counterpart. See Fed. R.Evid. 404(b). Our present rule provides:
Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

[N.J.R.E. 404(b).]
Our Supreme Court has characterized N.J.R.E. 404(b) as a "rule[] of exclusion" rather than one of "inclusion." State v. Nance, 148 N.J. 376, 386, 689 A.2d 1351 (1997); see also Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The basic principle underlying the rule is that "courts should exclude evidence of other crimes, civil wrongs, or acts ... when such evidence is offered solely to establish the forbidden inference of propensity or predisposition." State v. Nance, 148 N.J. at 386, 689 A.2d 1351; see State v. Stevens, 115 N.J. 289, 299, 558 A.2d 833 (1989); State v. Kociolek, 23 N.J. 400, 418-20, 129 A.2d 417 (1957). Although often cited in criminal trials, the prohibition is also applicable to civil cases. See, e.g., Burbridge v. Paschal, 239 N.J.Super. 139, 155, 570 A.2d 1250 (App. Div.), certif. denied, 122 N.J. 360, 585 A.2d 369 (1990).
We stress that N.J.R.E. 404(b) does not bar other crime or civil wrong evidence in all instances. By its clear terms, the Rule permits admission of such evidence when relevant to prove some fact genuinely in issue. State v. Marrero, 148 N.J. 469, 482, 691 A.2d 293 (1997); State v. Oliver, 133 N.J. 141, 151-154, 627 A.2d 144 (1993); State v. Stevens, 115 N.J. at 300, 558 A.2d 833. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue especially where the claimant's access to significant information is limited. See Huddleston v. United States, 485 U.S. at 685, 108 S.Ct. at 1499, 99 L.Ed.2d at 780. Where such evidence tends to make the existence of a material fact "reasonably likely" it should be admitted if its probative worth outweighs its potential for causing confusion, undue consumption of time or improper prejudice. State v. Marrero, 148 N.J. at 482, 691 A.2d 293; see N.J.R.E. 403.
In criminal cases, our Supreme Court has adopted a four-part test in determining the admissibility of other crime or civil wrong evidence. State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992). Specifically, the evidence must be: (1) admissible as relevant to a material issue, (2) similar in kind and reasonably close in time to the act alleged, (3) clear and convincing, and (4) of sufficient probative value not to be outweighed by its apparent prejudice. Ibid. (citing Abraham P. Ordover, Balancing The Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989) (footnote omitted)).
Our scope of review in addressing determinations on the admissibility of other crime or civil wrong evidence is relatively narrow. We must review the record in light of the contention advanced, but not initially from the point of view of how we would decide the matter if we were the court of first instance. The Supreme Court has emphasized that "[t]he trial court, because of its intimate knowledge of the case, is in the best position to engage in th[e] balancing process" required. State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); see also State v. Nance, 148 N.J. at 387-88, 689 A.2d 1351; State v. Marrero, 148 N.J. at 483-84, 691 A.2d 293; State v. DiFrisco, 137 N.J. 434, 496-97, 645 A.2d 734 (1994), cert. denied, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996). "Only where there is a `clear error of judgment' should the `trial court's conclusion with respect to that balancing test' be disturbed." State v. Marrero, 148 N.J. at 483, 691 A.2d 293 (quoting State v. DiFrisco, 137 N.J. at 496-97, 645 A.2d 734). These principles have particular pertinence here where we are reviewing a trial transcript consisting of thousands of *1192 pages and an equally extensive record of exhibits. We recognize that a witness's manner may negate the thrust of his printed word, just as it may supply corroboration the record will not show. We are obliged to accord deference to the determinations of the trial court that are substantially influenced by its opportunity to hear and see the witnesses and to have the "feel" of the case which we, as reviewing judges, cannot enjoy. So viewed, we cannot say that the "trial court's ruling `was so wide of the mark that a manifest denial of justice resulted.'" State v. Marrero, 148 N.J. at 484, 691 A.2d 293 (quoting State v. Kelly, 97 N.J. 178, 216, 478 A.2d 364 (1984)).

A.
Initially, we are satisfied that the evidence of prior and subsequent releases of gas was relevant to a material issue in dispute. We first address the question of the admissibility of gaseous emissions that preceded the events in question. It is important to note that plaintiffs' claim against defendant sounded in negligence. Although plaintiffs had moved to amend their complaint to add a count alleging strict liability, New Jersey Dep't of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 487-88, 468 A.2d 150 (1983), the trial court denied that application. Plaintiffs were thus required to prove that defendant had actual or constructive knowledge of the potential for endangering others and a reasonable opportunity to act in advance of the accidents that gave rise to the negligence claim.
Within this context, it has long been the law in New Jersey, see Ertle v. Starkey, 292 N.J.Super. 1, 8-9, 678 A.2d 261 (App.Div.1996); Muscato v. St. Mary's Catholic Church, 109 N.J.Super. 508, 510-11, 264 A.2d 74 (App.Div.1970); Karmazin v. Pennsylvania R.R. Co., 82 N.J.Super. 123, 129-30, 196 A.2d 803 (App.Div.1964); Schwartau v. Miesmer, 50 N.J.Super. 399, 413, 142 A.2d 675 (App.Div.), certif. denied, 28 N.J. 34, 144 A.2d 736 (1958); Kelley v. Curtiss, 29 N.J.Super. 291, 294, 302, 102 A.2d 471 (App. Div.), rev'd on other grounds, 16 N.J. 265, 108 A.2d 431 (1954), and elsewhere, Orjias v. Stevenson, 31 F.3d 995, 999-1000 (10th Cir.), cert. denied, 513 U.S. 1000, 115 S.Ct. 511, 130 L.Ed.2d 418 (1994); Borden, Inc. v. Florida East Coast Ry. Co., 772 F.2d 750, 754-57 (11th Cir.1985); Averitt v. Southland Motor Inn of Oklahoma, 720 F.2d 1178, 1181-82 (10th Cir.1983); Gardner v. Southern Ry. Sys., 675 F.2d 949, 952 (7th Cir.1982); Campus Sweater & Sportswear Co. v. M.B. Kahn Constr. Co., 515 F.Supp. 64, 89-90 (D.S.C. 1979), aff'd, 644 F.2d 877 (4th Cir.1981), that evidence of other acts may be offered to show a defendant's notice of a particular defect or danger involved, the magnitude of the defect or danger involved, and the defendant's ability to correct a known defect. We thus hold that the trial court did not abuse its discretion in admitting evidence of prior releases of emissions.
We next consider the admissibility of the evidence relating to subsequent gas releases. This evidence must be examined within the context of the material factual issues in dispute. Plaintiffs claimed that defendant's MgO unit was the source of the release of sulfur dioxide and hydrogen sulfide. Defendant denied that sulfur dioxide was released on the dates of the accidents. Indeed, defendant denied that its MgO unit had the capacity to generate hydrogen sulfide as a process gas. As part of its defense, defendant presented a myriad of hypotheses concerning the origin of the gases that injured the two plaintiffs. At several points in the trial, including defense counsel's opening statement, it was asserted that plaintiffs might have been poisoned by reason of their own negligent conduct in loading and unloading hazardous substances. Defendant presented evidence that plaintiffs had negligently handled chemical substances in other instances. Although defendant's claim of comparative fault was later abandoned, plaintiffs, as part of their case in chief, were obliged to exclude the hypotheses suggested by defendant and show that the MgO unit was the probable source or origin of the gases that migrated to their work station.
Plaintiffs' evidence that pungent sulfur odors were commonly emitted from the MgO unit, and that fence line monitors designed to detect the presence of sulfur dioxide sounded on several occasions following the two accidents *1193 tended to prove that defendant's facility was the source of the emissions on the dates in question. This evidence was not offered to establish a general "disposition" on the part of defendant to commit negligent acts. Nor did such evidence necessarily establish that defendant was negligent respecting the subsequent emissions. Instead, the evidence was highly probative with regard to the origin of the sulfur dioxide and hydrogen sulfide on the dates of the accident. More specifically, the evidence showed it was more likely than not that the sulfur dioxide and hydrogen sulfide which caused plaintiffs' injuries were produced by defendant's MgO unit.
We acknowledge that this case involved highly technical evidence dealing with complex questions of mechanical engineering, chemical reactions and air dispersion theories. However, the evidentiary question presented is no different than that commonly posed in more mundane contexts. A simple example will suffice. Surely, no one could reasonably object to the admission of evidence in a slip and fall case that both before and after the accident giving rise to the plaintiff's claim witnesses observed a structural defect in the sidewalk where the injury was sustained. Such evidence would have particular probative force in the event the landowner denied the existence of the structural defect on the date of the accident. In that situation, the Court of Errors and Appeals held that such "evidence [was] admissible to show that a condition of disrepair in fact existed...." Crouse v. Stacy-Trent Co., 110 N.J.L. 124, 128, 164 A. 294 (E. & A.1933). The proposition that "the subsequent existence of a quality or condition" may serve to establish its existence at an earlier time rests upon the general experience of humankind and is consonant with common sense. 2 Wigmore on Evidence § 382, at 406 (Chadbourn rev.1979); see also Kita v. Borough of Lindenwold, 305 N.J.Super. 43, 49-50, 701 A.2d 938 (App.Div.1997); cf. Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 290, 579 A.2d 1241 (1990) ("Evidence of prior similar accidents is relevant and should be admissible as evidence of the risk, or lack thereof, of a product."); Giovine v. Giovine, 284 N.J.Super. 3, 21-22, 663 A.2d 109 (App.Div.1995) (prior assaults admissible to prove battered wife syndrome), overruled on other grounds, Brennan v. Orban, 145 N.J. 282, 678 A.2d 667 (1996).
We add for the sake of completeness that other jurisdictions uniformly permit the introduction of evidence of other similar accidents or occurrences in a negligence action to show a defective or dangerous condition or causation. See, e.g., Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613, 625-26 (8th Cir.1983); Gumbs v. International Harvester, Inc., 718 F.2d 88, 97-98 (3d Cir.1983); Ramos v. Liberty Mut. Ins. Co., 615 F.2d 334, 338-40 (5th Cir.), modified, 620 F.2d 464 (5th Cir.1980), cert. denied sub nom., Rucker Co. v. Shell Oil Co., 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981); Elsworth v. Beech Aircraft Corp., 37 Cal.3d 540, 555, 208 Cal.Rptr. 874, 691 P.2d 630, 639-40 (1984), cert. denied, 471 U.S. 1110, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985); Gilbert v. Pessin Grocery Co., 132 Cal.App.2d 212, 216-17, 282 P.2d 148, 153-54 (Cal.Ct.App.1955); Carter v. Yardley & Co., 319 Mass. 92, 93-94, 64 N.E.2d 693, 694-95 (1946); Simon v. Town of Kennebunkport, 417 A.2d 982, 984-86 (Me. 1980). In Simon v. Town of Kennebunkport, 417 A.2d 982, Maine's highest court said that
where the proponent can show that other accidents occurred under circumstances substantially similar to those prevailing at the time of the injury in question such evidence is admissible subject to exclusion by the trial court when the probative value of the evidence on the issue[ ] of defect ... is substantially outweighed by the danger of unfair prejudice or confusion of the issues or by consideration of undue delay.

[Id. at 984.]
Likewise, in Elsworth v. Beech Aircraft Corp., 37 Cal.3d 540, 208 Cal.Rptr. 874, 691 P.2d 630, California's Supreme Court held that "[e]vidence of [other] accidents is admissible to prove a defective condition ... provided that the circumstances of the other accidents are similar and not too remote." Id. at 555, 208 Cal.Rptr. 874, 691 P.2d at 639. Legal commentators join in this view. See, e.g., 1 McCormick on Evidence § 200, at 847 (4th ed.1992); 1A Wigmore on Evidence *1194 § 65, at 1427 n. 3 (Tillers rev.1983). We thus conclude that the evidence was relevant and competent to prove a material fact in dispute.

B.
We are also satisfied that the other releases were sufficiently similar in kind and reasonably close in time to the dates of the accidents to allow for their admission. In reaching this conclusion, we recognize some of the weakness of the evidence in terms of temporal proximity. We also acknowledge that not all of the evidence was specific to the MgO unit. This much conceded, we cannot fairly say that the trial court's assessment of the probative worth of the evidence in terms of time and similarity constituted an abuse of discretion or a "`clear error of judgment.'" State v. Marrero, 148 N.J. at 483, 691 A.2d 293 (quoting State v. DiFrisco, 137 N.J. at 496, 645 A.2d 734).
The other instances of gas emissions were sufficiently similar and proximate to "hav[e] a tendency in reason to prove" the fact sought to be established. N.J.R.E. 401. The probative value of the evidence consisted of its "tendency ... to establish the proposition that it [was] offered to prove." State v. Wilson, 135 N.J. 4, 13, 637 A.2d 1237 (1994). In that context, the trial court could reasonably have concluded that there was a sufficient "logical connection between the ... evidence [presented] and a fact in issue." State v. Hutchins, 241 N.J.Super. 353, 358, 575 A.2d 35 (App.Div.1990). We perceive no sound basis to disturb the trial court's conclusion in that respect.

C.
As we noted earlier, our Supreme Court said in State v. Cofield, 127 N.J. at 338, 605 A.2d 230, that in the context of criminal trials, evidence of other crimes or civil wrongs must be "clear and convincing." In Burbridge v. Paschal, 239 N.J.Super. 139, 570 A.2d 1250, a decision that preceded Cofield, we held that "a preponderance of evidence burden ... [was] sufficient in a civil case." Id. at 155, 570 A.2d 1250. Although Burbridge was not cited in Cofield, and has not been referred to in more recent Supreme Court decisions on the subject, see State v. Nance, 148 N.J. 376, 689 A.2d 1351; State v. Marrero, 148 N.J. 469, 691 A.2d 293; State v. Oliver, 133 N.J. 141, 627 A.2d 144, it is arguable that the distinction between criminal and civil trials drawn in Burbridge is supported by reason. "The underlying danger of admitting other-crime evidence [in a criminal case] is that the jury may convict the defendant because he is `a bad person in general.'" State v. Cofield, 127 N.J. at 336, 605 A.2d 230 (quoting State v. Gibbons, 105 N.J. 67, 77, 519 A.2d 350 (1987)). The danger of undue prejudice in admitting evidence of other civil wrongs against a defendant in a civil case is arguably less acute. However, we choose to apply the clear and convincing evidence standard in this case because the issue has not been authoritatively decided by the Supreme Court.
We again acknowledge weakness in the other civil wrong evidence presented. For example, defendant vigorously attacks the reliability of the evidence presented by several Hoechst-Celanese lay witnesses that Peridot was the source of pungent sulfur odors. Some of these witnesses testified that these odors were particularly strong when the wind was blowing from the north. Defendant asserts that evidence of this kind can only be presented in the form of expert opinion. We, of course, recognize the frailties inherent in the opinion testimony of the Hoechst-Celanese employees. But we, nevertheless, think that you do not need a weatherman to know which way the wind is blowing. We are satisfied that this evidence was admissible, see N.J.R.E. 701; State v. Risden, 56 N.J. 27, 40, 264 A.2d 214 (1970), and at times quite compelling. Indeed, some of the complaints made by these individuals were corroborated by defendant's own employees.
We cannot fairly say that the trial court erred in its determination that the evidence presented was of sufficient probative worth to permit its admission. While perhaps some of the evidence was of questionable reliability, the testimony, on balance, satisfied the applicable standard of proof.

*1195 D.
We are satisfied that the probative value of the evidence was not outweighed by the risk of undue prejudice. N.J.R.E. 403; State v. Cofield, 127 N.J. at 338, 605 A.2d 230. In performing the weighing process required by N.J.R.E. 403 and Cofield, the trial court's discretion "is a broad one." State v. Sands, 76 N.J. 127, 144, 386 A.2d 378 (1978), modified, State v. Brunson, 132 N.J. 377, 625 A.2d 1085 (1993); see also State v. Hicks, 283 N.J.Super. 301, 661 A.2d 1300 (App.Div.), certif. denied, 143 N.J. 327, 670 A.2d 1068 (1996); State v. Goode, 278 N.J.Super. 85, 650 A.2d 393 (App.Div.1994). Only where there has been "a clear error of judgment" should the trial court's decision be reversed. State v. Koedatich, 112 N.J. 225, 313, 548 A.2d 939 (1988) (citing State v. Balthrop, 92 N.J. 542, 548, 457 A.2d 1152 (1983) (Schreiber, J., dissenting)), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989); see State v. Carter, 91 N.J. 86, 106-07, 449 A.2d 1280 (1982); see also Thomas v. Toys "R" Us, Inc., 282 N.J.Super. 569, 582-83, 660 A.2d 1236 (App.Div.), certif. denied, 142 N.J. 574, 667 A.2d 191 (1995). We find no abuse of the trial court's discretion here.

E.
Once the proponent has demonstrated the admissibility of other crime or civil wrong evidence and the court has engaged in the balancing process we have described, the jury must be instructed on the limited use of the proofs actually presented. In the context of criminal trials, our Supreme Court has explained that because "the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction," State v. Stevens, 115 N.J. at 309, 558 A.2d 833, the instructions should be formulated carefully to enable the jury to comprehend the fine distinction to which it is required to adhere. State v. Cofield, 127 N.J. at 341, 605 A.2d 230. The trial court "should state specifically the purposes for which the evidence may be considered and, to the extent necessary for the jury's understanding, the issues on which such evidence is not to be considered." State v. Stevens, 115 N.J. at 309, 558 A.2d 833.
No limiting instruction was given. New Jersey Rules of Evidence 105 states that "[w]hen evidence is admitted ... for one purpose but is not admissible ... for another purpose, the judge, upon request, shall restrict the evidence to its proper scope and shall instruct the jury accordingly but may permit a party to waive a limiting instruction." Plaintiffs argue that defendant deliberately did not ask for a limiting instruction for strategic reasons. As we noted earlier, defendant's attorney in his opening statement boldly announced to the jury that "what happened to these two plaintiffs was something that they did to themselves in the course of their work." The defense subsequently claimed that because another Hoechst-Celanese employee, Leonard Zacrewski, had been seriously injured by a "splash" of acetic acid while unlocking a hose, it was possible that Smith had been injured in the same way. References were also made to Smith having been reprimanded for failing to use a hose "scrubber" in March of 1992 and to the possibility that she made a similar error on the date of the second accident. The defense further asserted that Hoechst-Celanese had experienced maintenance problems in the past, and suggested that perhaps these difficulties somehow contributed to the accident on July 7, 1992. The trial court ultimately ruled that evidence of Smith's prior acts of negligence was barred, but nonetheless, major portions of this evidence had already been admitted and were never struck from the record. At the conclusion of the trial, defendant voluntarily withdrew its defense of comparative negligence. But defendant's attorney at the charging conference immediately prior to summation noted his intention to refer in his closing statement to other, unrelated acts of negligence committed by Hoechst-Celanese employees, particularly those of Zacrewski, in arguing that Peridot's actions were not a "proximate cause of plaintiffs' injuries." Plaintiffs thus contend that defendant deliberately failed to request a limiting instruction because it calculated that the jury would find more persuasive its evidence relating to plaintiffs' other acts of negligence than plaintiffs' *1196 evidence relating to prior and subsequent releases of gas from the MgO unit.
While plaintiffs' argument seems plausible, we cannot say with utter confidence that defendant deliberately waived a limiting instruction. It is also possible that defendant's failure to submit a request to charge on the subject was inadvertent. There is some indication in the record that the attorneys believed that a limiting instruction respecting the other acts evidence had been given. As we will discuss later, the instruction actually given pertained to the evidence of other releases of gases from the MgO unit as it related to the issue of subsequent remedial measures. We hasten to add that the trial court conducted an extensive charging conference in which it exhaustively reviewed with counsel each part of its proposed jury instructions. A lengthy colloquy ensued between counsel and the court during which substantial portions of the witnesses' testimony and documentary evidence were described in considerable detail. Although defendant's attorney made substantial contributions to this discussion, the record is strangely silent respecting the subject of other civil wrong evidence and the need for a limiting instruction. So too, although afforded ample opportunity to raise his objections to the jury instruction, defendant's attorney sat idly by.
It is fundamental in our practice that a claim of error which could have been but was not raised at trial will not be dealt with as would a timely challenge. The reasons are several. It is certainly possible that in the context of the entire trial, the failure to object signifies that the error belatedly claimed was actually of no moment. Moreover, to rerun a trial when the mistake could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal. We do not deem it a palliative to explore the thoughts of trial counsel or his pertinent conversations with his now unhappy client. Such inquiries tend to demean the attorney-client relationship with no compensating gain. State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971).
Whether or not counsel's failure to seek a limiting instruction or interpose a timely objection was deliberate, we would be myopic were we to see no more than the case before us. It is idle to suppose that our decisions, whether published or not, have no real impact on the trial bar or at the worst a minimal one. The realities abound the other way. By recognizing a belated challenge that could have been advanced below, we encourage the trial bar to "lie in wait" and reward slovenly practice. Throughout this opinion for the ease of description we have referred to actions taken or not taken by defendant's "attorney." But in reality, defendant engaged the assistance of a full battery of attorneys who contributed to the presentation of the defense. We do not imply or suggest that this was unfair. The point to be stressed, however, is that our practice offers every opportunity for a fair trial. Unless there is some order in the trial of cases, we cannot hope to meet the swollen demands upon our system. See State v. Thomas, 245 N.J.Super. 428, 440, 586 A.2d 250 (App.Div.1991) (Baime, J.A.D., dissenting).
But even from the prism of afterthought, defendant has not persuaded us that the failure to give a limiting instruction was prejudicial. State v. Brown, 138 N.J. 481, 534-35, 651 A.2d 19 (1994), overruled on other grounds, State v. Cooper, 151 N.J. 326, 700 A.2d 306 (1997); State v. Montesano, 298 N.J.Super. 597, 617-18, 689 A.2d 1373 (App. Div.), certif. denied, 150 N.J. 27, 695 A.2d 670 (1997). A fair and accurate limiting instruction in this case would have to encompass the principle that the jury could consider prior releases of gases from the MgO plant as tending to prove that defendant had actual or constructive notice of a possible dangerous or defective condition in its recycling process. It would have to apprise the jury that it could consider subsequent releases as tending to establish the origin or source of the sulfur dioxide and hydrogen sulfide on the dates of the accident. And, to be entirely fair, such an instruction would have to be accompanied by a curative charge either striking from the record the defendant's other civil wrong evidence or sharply limiting the jury's consideration of such proofs. We have analyzed this aspect of the case in detail *1197 to see whether it might reasonably have influenced the jury against defendant. We find that the error belatedly recognized did not have the capacity to lead to an unjust result. R. 2:10-2; Green v. General Motors Corp., 310 N.J.Super. 507, 532, 709 A.2d 205, 217 (App.Div.1998); Atlas v. Silvan, 128 N.J.Super. 247, 252, 319 A.2d 758 (App.Div. 1974); State v. Harper, 128 N.J.Super. 270, 277, 319 A.2d 771 (App.Div.), certif. denied, 65 N.J. 574, 325 A.2d 708 (1974).

III.
Defendant next contends that the trial court erred in admitting evidence pertaining to remedial measures taken after the first accident but before the second. This argument is advanced against the backdrop of the following salient facts.
On September 30, 1991, several weeks after the first accident, a meeting was conducted between key employees of Hoechst-Celanese and Peridot. Conflicting evidence was presented concerning the genesis of this meeting. According to defendant, the meeting was called to discuss Peridot's planned implementation of certain changes to its MgO unit as required by its registration with the Department of Environmental Protection (DEP) pursuant to the Toxic Catastrophe Prevention Act (N.J.S.A. 13:1K-19 to -35). Many of these changes were mandated by a consent order entered into by Peridot and the DEP in April 1991, months before the first accident. Defendant further claimed that it prepared a "What If Analysis" and an "Air Dispersion Report" in accordance with its agreement with the DEP. These reports contained various contingency plans in the event sulfur dioxide were to escape into the atmosphere. In contrast, plaintiffs contended that the purpose of the meeting was to review the incident that occurred on September 1991 and to "discuss action items [defendant intended] to implement in order to prevent a reoccurrence." In any event, among the items discussed at the meeting was Peridot's plan to install perimeter fence line monitors to detect sulfur dioxide leaks, and to either raise the MgO unit's stack heights or introduce an internal scrubber system. Also discussed was defendant's plan to modify its operating procedures regarding the start-up of the MgO unit. It is undisputed that defendant installed the fence line monitors and raised the stack heights prior to the second accident.
Over defendant's vigorous objection, plaintiffs were allowed to introduce evidence relating to those safety measures for the purpose of showing "the feasibility of a release" and the "source of [the] chemicals" that were allegedly emitted on the dates of the accidents. Defendant's attorney submitted a request to charge on the subject and asked that the jury be instructed prior to the admission of the evidence. Although the trial court struck portions of the proposed charge in order to delete what it characterized as "legalese," it is clear that the instructions actually given were substantially similar in many aspects to counsel's requested charge. The trial court instructed the jury as follows:
The attorneys have indicated to me that we are about to hear some testimony from this witness about certain actions which if you find them to be taken by them [sic] to have been accomplished, they were taken by Peridot Corporation after, subsequent to, the alleged releases on September 9, 1991, and you may hear some testimony about actions that may have been taken after the alleged releases on July 7, 1992.
Now our evidence rules do not normally allow such testimony to be used to prove the negligence of anyone, of Peridot in this case. Subsequent remedial measures are not allowed to be used as evidence of negligence. If theif we allowed that, then no one would ever correct a problem.
Let's take by analogy, if there was a hole in the street, right out here in the street, and everyone was getting injured by it, but if the fixing of that hole was allowed in a later trial to show that yeah, whoever created the hole was negligent in doing so, then no one would ever fix anything.
So as a matter of public policy, our Court rules don't normally allow evidence of subsequent remedial measures to be used as proof of negligence. All right? That evidence is however allowed to show other issues.

*1198 So I'm instructing you that the evidence that you're about to hear about any subsequent remedial measures, any actions taken after one or the other of these alleged incidents, is not evidence of negligence of Peridot on the indicated dates that they are charged with negligence.
You may consider the testimony regarding other issues that may be established in the case. If you hear testimony regarding such things as them having notice of a problem, the feasibility of a different way of avoiding a particular type of danger; the exercise of control over property; credibility; actions that can be construed as maintaining their property; then you can consider it in line with those type of issues, but not as to the question of negligence onat the times that they are charged with being negligent.
Portions of this charge were repeated after the direct examination of Ann Coogan, Hoechst-Celanese's environmental health and safety representative. Defendant neither interposed an objection nor sought clarification.
New Jersey Rules of Evidence 407 provides as follows:
[e]vidence of remedial measures taken after an event is not admissible to prove that the event was caused by negligence or culpable conduct. However, evidence of such subsequent remedial conduct may be admitted as to other issues.
The Rule tracks the language contained in Evid. R. 51, its predecessor, and embraces a public policy that is well established in New Jersey law. See, e.g., Rynar v. Lincoln Transit Co., Inc., 129 N.J.L. 525, 30 A.2d 406 (E. & A.1943); Hansson v. Catalytic Constr. Co., 43 N.J.Super. 23, 127 A.2d 431 (App.Div. 1956); Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 407 (1997-98); Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574, 591 (1956). "[E]vidence of remedial measures is excluded not because it lacks relevancy," but because admission of said testimony might discourage corrective action and induce perpetuation of the damage and condition that gave rise to the lawsuit. Hansson v. Catalytic Constr. Co., 43 N.J.Super. at 29, 127 A.2d 431. "The theory behind the Rule is that a person should not be penalized for correcting a potentially deleterious situation." Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 407; cf. Payton v. New Jersey Turnpike Auth., 148 N.J. 524, 544, 691 A.2d 321 (1997) (discussing policy underlying "privilege of self-critical analysis").
We are satisfied that the evidentiary prohibition was not applicable in this case. Initially, we point to defendant's factual assertion that the measures taken between the first and second accidents were not "remedial," but instead were taken in order to satisfy the requirements of the Toxic Catastrophe Prevention Act. If, as defendant contends, its decision to install fence line monitors, increase the stack heights, and create contingency plans in the event of an inadvertent release of sulfur dioxide was not a voluntary action, but rather was mandated by the DEP, admission of the evidence would not violate the policy underlying the Rule. See Cepeda v. Cumberland Eng'g Co., Inc., 76 N.J. 152, 193 n. 11, 386 A.2d 816 (1978), overruled on other grounds, Suter v. San Angelo Foundry & Mach. Co., 81 N.J. 150, 406 A.2d 140 (1979).
Beyond this, the evidence of remedial measures clearly fell within an exception to the general prohibition of the Rule. New Jersey Rules of Evidence 407 "excludes relevant evidence only if that evidence is used `to prove negligence or culpable conduct.'" Brown v. Brown 86 N.J. 565, 581, 432 A.2d 493 (1981) (quoting Evid. R. 51). "Thus, where such evidence is offered for relevant purposes other than negligence or culpable conduct it is admissible." Ibid. Evidence of subsequent remedial action has been admitted to show control, Manieri v. Volkswagenwerk, 151 N.J.Super. 422, 432, 376 A.2d 1317 (App.Div.1977), certif. denied, 75 N.J. 594, 384 A.2d 824 (1978); Reid v. Monmouth Oil Co., 42 N.J.Super. 355, 362-63, 126 A.2d 368 (App.Div.1956), to demonstrate feasibility and practicality of repair, Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392, 395-96 (5th Cir.1972), and to impeach the credibility of a witness, Hansson v. Catalytic Constr. Co., 43 N.J.Super. at 27-29, 127 A.2d 431.
*1199 Most importantly, evidence of subsequent corrective measures has long been permitted in New Jersey to prove "the condition existing at the time of the accident." Lavin v. Fauci, 170 N.J.Super. 403, 407, 406 A.2d 978 (App.Div.1979) (citing Millman v. United States Mortgage & Title Guar. Co. of New Jersey, 121 N.J.L. 28, 34-35, 1 A.2d 265 (Sup.Ct.1938)); see Jerolamon v. Town of Belleville, 90 N.J.L. 206, 207-08, 101 A. 244 (E. & A.1917); Perry v. Levy, 87 N.J.L. 670, 672, 94 A. 569 (E. & A.1915). In Perry v. Levy, 87 N.J.L. 670, 94 A. 569, for example, the plaintiff brought suit against the defendant, her landlord, for injuries sustained due to a falling ceiling. At trial, a witness was permitted to testify that the landlord had the ceiling repaired after the accident. Id. at 672, 94 A. 569. On appeal from a judgment against him, the defendant argued that the trial court committed error by admitting the evidence of subsequent repairs. The Court of Errors and Appeals held that "the evidence was competent ... to show" that the roof was in a defective condition at the time of the accident. Ibid. In reaching this conclusion, the Court reasoned that the evidence of remedial measures bore "on the landlord's liability, not his negligence." Ibid.
In Millman v. United States Mortgage & Title Guaranty Co. of New Jersey, 121 N.J.L. 28, 1 A.2d 265, the plaintiff sued his landlord for injuries sustained when he fell down a common stairway. Examination of the steps immediately after the accident disclosed a bent screw that allegedly caused the plaintiff to fall. Id. at 30, 1 A.2d 265. The defendant denied the claimed structural defect. It maintained that, at the time of the accident, the step was properly held in place. Over the defendant's objection, the plaintiff was allowed to admit evidence indicating that the step had been repaired immediately after the accident. Id. at 31, 1 A.2d 265. Judgment was entered in the plaintiff's favor. On appeal, the defendant asserted that the trial court erred by admitting evidence of remedial measures taken after the accident. While acknowledging the rule excluding evidence of subsequent repairs to prove negligence, the court concluded that the testimony had been properly admitted. Id. at 34-35, 1 A.2d 265. The court emphasized that "[o]ne of the basic inquiries was the existence of the pleaded structural defect at the time of the mishap," and that the evidence bore upon that "essential question." Ibid.
In Jerolamon v. Belleville, 90 N.J.L. 206, 101 A. 244, a suit for damages ensuing from the overflowing of the plaintiff's land by water, proof of subsequent changes made by the defendant in the drainage system was held admissible. Id. at 208-09, 101 A. 244. The defendant's engineer had denied "that the flood water had run down the street in any such quantity as to do material damage." Id. at 208, 101 A. 244. In affirming the judgment, the court explained:
This was a material point in plaintiff's case, and to meet it he was entitled to bring out that defendant had taken care of this storm water by a special sewer; the inference of course being that unless there were a material amount of storm water, the culvert would not have been built, and its building was evidential of the incorrectness of the witness' statement.

[Id. at 208, 101 A. 244.]
Other jurisdictions have also concluded that evidence of remedial actions is admissible to prove that an event occurred or that a place or thing was in a particular condition at the time of an accident. See, e.g., Bailey v. Kawasaki-Kisen, K.K., 455 F.2d at 394-96; Baroldy v. Ortho Pharm. Corp., 157 Ariz. 574, 584-85, 760 P.2d 574, 584-85 (Ariz.Ct. App.1988); Rose v. Figgie Int'l, Inc., 229 Ga.App. 848, 850, 495 S.E.2d 77, 80-81 (Ga. Ct.App.1997); CSX Transp., Inc. v. Monhollen, 229 Ga.App. 516, 519-20, 494 S.E.2d 202, 205-06 (Ga.Ct.App.1997); Stinson v. E.I. DuPont De Nemours and Co., 904 S.W.2d 428, 432 (Mo.Ct.App.1995).
Although none of these decisions deal with the precise issue presented here, they support the proposition that in a variety of factual settings, evidence of subsequent remedial measures is admissible to rebut the defense that the accident did not happen in the manner claimed. Furthermore, we are not concerned here with evidence pertaining to prior negligent acts to establish negligent conduct on a particular date. Instead, the evidence here focused upon the claim that *1200 the design of the MgO processing unit was defective. Therefore, evidence of the remedial measures taken by defendant, such as the raising of the MgO plant's stacks, installation of several fence line SO2 monitors and the creation of contingency plans in the event of an industrial accident causing the release of sulfur dioxide, tended to establish the existence of the alleged defect. Ryan v. KDI Sylvan Pools, Inc., 121 N.J. at 290, 579 A.2d 1241.
Thus, wholly apart from the fact that defendant's remedial conduct was not voluntary but rather mandated by statute and an administrative order entered by the DEP, we are convinced that this evidence was admissible to prove that the sulfur dioxide and hydrogen sulfide were released from the MgO plant on September 9, 1991. The question presented here, although far more complex, is similar to those in Perry v. Levy, 87 N.J.L. 670, 94 A. 569, where evidence of repairs was held to have been properly admitted to prove the defective condition of the ceiling on the date of the accident, Millman v. United States Mortgage & Title Guar. Co. of New Jersey, 121 N.J.L. 28, 1 A.2d 265, where evidence of remedial action was held to have been properly admitted to prove the defective stairway at the time of the accident, Jerolamon v. Town of Belleville, 90 N.J.L. 206, 101 A. 244, where evidence of repairs to a drainage system was held to have been properly admitted to show that the plaintiff's property was in fact damaged by flooding waters, and the other decisions we have cited, where evidence of remedial conduct was held to be admissible to show the accident occurred in the manner claimed by the particular plaintiff. Specifically, evidence of defendant's corrective measures was admissible to prove that the gaseous fumes that injured Smith were in fact released from the MgO unit.
We come then to defendant's attack upon the trial court's limiting instruction. Although the trial court repeatedly emphasized that evidence of remedial conduct could not be considered in determining whether or not defendant was negligent, its description of the appropriate use of such evidence was hardly a model of clarity. However, defendant is in a poor position to complain. As we noted earlier, much of the trial court's instruction was taken from defendant's proposed charge. Moreover, defendant never objected to the trial court's instruction. It is axiomatic that "[t]rial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. Harper, 128 N.J.Super. 270, 277, 319 A.2d 771 (App.Div.), certif. denied, 65 N.J. 574, 325 A.2d 708 (1974). Our Supreme Court has said that under the invited error doctrine the particular mistake belatedly recognized on appeal must "cut mortally into the substantive rights" of the appellant to warrant a reversal. State v. Corsaro, 107 N.J. 339, 345, 526 A.2d 1046 (1987) (quoting State v. Harper, 128 N.J.Super. at 277, 319 A.2d 771). Applying this test, we are thoroughly convinced that the trial court's charge did not demonstrably impair the defendant's defense on the merits. Nor did it convey specifically an erroneous legal principle. At worst, the instruction can be characterized as telling the jury too little, not too much. Simply put, the error was not so egregious as to justify a rerun of the trial.
The result would be the same if we were to consider the court's charge in the context of the plain error doctrine. See R. 2:10-2. Clearly, the error would have been dissipated had a timely objection been interposed. State v. Macon, 57 N.J. at 337, 273 A.2d 1. Moreover, an appropriate limiting instruction undoubtedly would have emphasized the tendency of the evidence of remedial repairs to establish the origin or source of the sulfur dioxide and hydrogen sulfide on the date of the first accident. We add that an appropriate instruction would also have apprised the jury that the corrective measures taken after the first accident tended to prove defendant's knowledge of the dangers attributable to the chemical operations at the MgO unit, a critical element of plaintiffs' claim of negligence with respect to the more serious second accident. We find no reasonable possibility that the faulty limiting instruction deprived defendant of a fair trial or a fair decision on the merits.

*1201 IV.
We now turn to defendant's claim that the testimony of Dr. Davidson and Dr. Schwartz should have been excluded as "net opinions." More specifically, defendant asserts that the opinions reached by plaintiffs' experts consisted of "bare conclusions, unsupported by factual evidence." Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). We reject this argument.
An extensive hearing was conducted out of the presence of the jury to determine the admissibility of Dr. Davidson's opinion testimony. Much of Dr. Davidson's testimony focused upon whether there could have been more than one release of sulfur dioxide and hydrogen sulfide from the MgO unit on the date of each accident. Defense counsel challenged Davidson's opinion that more than one release was possible. In response, Davidson explained that there could have been "just one [release if it was] really large enough." Davidson then described a "dispersion model" that accounted for the migration of gases to plaintiffs' work station. Following the hearing, defendant withdrew many of its objections to Davidson's testimony. Although defendant's specific objections have not been resurrected on appeal, it is argued that Davidson was improperly permitted to "reason[ ] backwards from the plaintiffs' injur[ies] to conclude that there had been a release" from the MgO unit. Citing Sorensen By and Through Dunbar v. Shaklee Corp., 31 F.3d 638, 648-51 (8th Cir. 1994); In re TMI Litigation Consol. Proceedings, 927 F.Supp. 834, 857-58 (M.D.Pa. 1996); and Renaud v. Martin Marietta Corp., 749 F.Supp. 1545, 1551-52 (D.Colo. 1990), aff'd, 972 F.2d 304 (10th Cir.1992), defendant argues that Davidson offered unreliable testimony indicating that gases were emitted from the MgO unit.
It is true, as defendant contends, that Davidson relied in part on the nature and extent of plaintiffs' injuries in determining the manner in which gases were inadvertently released from defendant's plant. More specifically, the witness concluded that the injuries sustained were consistent with his hypotheses concerning the amount of gases that were expelled from the MgO unit and the manner in which they migrated. Davidson testified that his conclusion rested on "both sides of the equation," i.e., the extent of plaintiffs' exposure resulting in the injuries sustained and the various defects he found in the operation of the MgO unit. We find no error in admitting this testimony. It cannot fairly be said, as it was in Sorensen By and Through Dunbar v. Shaklee Corp., 31 F.3d at 649, that "[i]nstead of reasoning from known facts to reach a conclusion, [Davidson] here reasoned from an end result in order to hypothesize what needed to be known but what was not." To the contrary, Davidson testified that specific defects in the operation of the MgO unit caused sulfur dioxide and hydrogen sulfide to be expelled from defendant's plant and that the injuries sustained by plaintiffs were consistent with the nature and extent of their exposure to these substances. We conclude that Davidson's opinion testimony was "based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field." Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449, 593 A.2d 733 (1991); see also Landrigan v. Celotex Corp., 127 N.J. 404, 413-14, 605 A.2d 1079 (1992); State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984).
Equally unpersuasive is defendant's attack upon Dr. Schwartz's opinion testimony that defendant's MgO unit produced hydrogen sulfide in its process gases. In reaching his conclusion, Schwartz referred to "fundamental literature" in the field of chemistry, and described in detail the manner in which the chemical reactions occurred to form hydrogen sulfide. We find no abuse of discretion in the trial court's admission of the testimony.

V.
Defendant's attack upon Dr. Panitz's testimony is without merit and does not require extended discussion. Based upon her expertise in occupational medicine, the witness was sufficiently qualified to address questions concerning the likelihood that hydrogen sulfide was generated at the MgO unit and that the combination of that gas and *1202 sulfur dioxide caused plaintiffs' injuries. Panitz's testimony concerning the hazards of hydrogen sulfide in the "sulfur producing industry" was expressly tied to her "more than twenty years' experience" as an occupational and environmental physician. The witness's brief allusion to the fact that defendant had not notified the DEP of the presence of hydrogen sulfide in its chemical operations cannot reasonably be faulted. This comment was made by the witness in explaining why the diagnosis of hydrogen sulfide poisoning was not immediate.
We also reject defendant's claim that Panitz should not have been permitted to rely on the "Poza Rica study" in forming her opinion that plaintiffs were exposed to hydrogen sulfide. In her report, Panitz referred to "a catastrophic release of hydrogen sulfide in Poza Rica, Mexico in 1951" which resulted in the death of twenty-two people and the hospitalization of many others. Panitz compared the symptoms of forty-seven Poza Rica survivors to those exhibited by the plaintiffs. Because the injuries sustained by the victims of the Poza Rica disaster were considered "analogous" to those suffered by plaintiffs, Panitz compared their "exposure block" and concluded that the "correlation [between the two incidents] was strong." Panitz testified that "based on the spectrum of illness" disclosed in the Poza Rica study, she could "estimate a measurement of the amount of [hydrogen sulfide] exposure" suffered by plaintiffs.
We perceive no reversible error in Panitz's description of the statistical categories of injuries sustained by the Poza Rica victims and their correlation to plaintiffs' injuries. The trial court could reasonably have found that the data and information cited by Panitz was "of the type reasonably relied on by experts in the scientific field" of occupational medicine. Rubanick v. Witco Chem. Corp., 125 N.J. at 449, 593 A.2d 733.

VI.
Defendant's final point is that the trial court erred by compelling it to continue paying post-judgment interest on the verdict amount after it deposited the money in court pending this appeal. We agree. Rule 4:48-3(a)(3) provides that the "court shall on motion order the clerk ... to accept payment [of the judgment] with interests and costs, and, upon receiving payment, to enter satisfaction... on the record, if it shall appear... [a]n appeal is pending or the time limited for taking an appeal has not expired and the moving party intends to appeal ...." Although not a model of clarity, the Rule requires the court to receive the deposit in satisfaction where "an appeal is pending."
In DiBenedetto v. Estate of DiBenedetto, 219 N.J.Super. 440, 530 A.2d 800 (App.Div. 1987), we held that the rule was not applicable because the deposit made was "in lieu of a supersedeas bond" which "kept [the] plaintiff from executing his judgment." Id. at 445, 530 A.2d 800. In that situation, we said that "[t]he deposit ... was not the functional equivalent of paying the claimant...." Ibid.
In contrast, no application for a stay was made in this case. Defendant did nothing to stop plaintiffs from obtaining the benefit of their judgment. Interest should not accrue on the judgment from the date the deposit was made.
The judgment is affirmed in part and reversed in part. The matter is remanded for modification of the judgment consistent with this opinion.